DEC-31-2003 13:42 FROM:                                      TO:612026254363.              P.2/7



## OPTION/LITERARY PURCHASE AGREEMENT

THIS OPTION/LITERARY PURCHASE AGREEMENT, is made and entered into as of December 12, 2003, by and between Loida Nicolas Lewis (hereinafter "Owner") and BroadcastUrban FilmWorks, L.L.C. (hereinafter "Purchaser").

### 1. OWNER'S REPRESENTATIONS AND WARRANTIES:

(a) Sole Proprietor: Owner represents and warrants to Purchaser that Owner is the sole and exclusive proprietor, throughout the world of that certain original literary Property written by Reginald F. Lewis and Blair S. Walker, entitled " Why Should White Guys Have All the Fun?," (hereinafter "the Literary Property" or "Property").

(b) Facts: Owner represents and warrants to Purchaser that the following statements are true and correct in all respects with respect to said Literary Property:

(i) Reginald F. Lewis and Blair S. Walker are the sole authors of the Literary Property.

(ii) The Literary Property was first published on October 14, 1994 by John Wiley & Sons, Inc., under the title of " Why Should White Guys Have All the Fun?," and was registered for copyright on March 17, 1995 in the name of Loida Nicolas Lewis, under Copyright registration number TX-4-000-690 in the office of the United States Register of Copyrights, Washington D.C.

Except for the publication of the Literary Property as set forth above, and a television documentary on Mr. Lewis' life for the American Legacy Television Series/Video Collection, no Motion Picture or dramatic version of the Literary Property, or any part thereof, has been manufactured, produced, presented or authorized; no radio or television development, presentation or program based on the Literary Property, or any part thereof, has been manufactured, produced, presented, broadcast or authorized; and no written or oral agreements or commitments whatsoever with respect to the Literary Property or with respect to any right therein, have heretofore been made or entered into by or on behalf of Owner.

(c) No Infringement or Violation of Third Party Rights: Owner represents and warrants to Purchaser that Owner has not adapted the Literary Property from any other literary, dramatic or other material of any kind, nature or description, nor, excepting for material which is in the public domain, has Owner copied or used in the Literary Property the plot, scenes, sequence or story of any other literary, dramatic or other material; that the Literary Property does not infringe upon any common law or statutory rights in any other literary, dramatic, or other material; that insofar as Owner has knowledge, no material in the Literary Property is libelous or violative of the right of privacy of any person; and that the Literary Property is presently not in the public domain in any country in the world where copyright protection is available.

1

EXHIBIT A

P.1/6                    TO:2007897349                                    AUG-10-2009 13:24 FROM:

DEC-31-2003 13:42 FROM:                                TO:612026254363            P.3/7

(d) No Impairment of Rights:  Owner represents and warrants to Purchaser that Owner is the exclusive proprietor, throughout the world, of the rights in the Literary Property which are covered by the within option; that Owner has not assigned, licensed nor in any manner encumbered, diminished or impaired these rights; that Owner has not committed nor omitted to perform any act by which these rights could or will be encumbered, diminished or impaired; and that there is no outstanding claim or litigation pending against or involving the title, ownership and/or copyright in the Literary Property, or in any part thereof, or in the rights which are covered by the within option.  Owner further represents and warrants that Owner will not attempt hereafter to encumber, diminish or impair any of the rights herein granted and that all appropriate protections of such rights will continue to be maintained by Owner.

Without limiting any other rights Purchaser may have in the Literary Property, Owner hereby agrees that if there is any claim and/or litigation involving any breach or alleged breach of any such representations and warranties of Owner, the option period granted hereunder and any periods within which Purchaser may, pursuant to the provisions of Clause 3 hereof, extend the option, shall automatically be extended until no claim and/or litigation involving any breach or alleged breach of any such representation and warranties of Owner is outstanding . Owner hereby agrees to repay Purchaser any monies paid by purchaser to Owner hereunder in connection with the Literary Property. Should a Court or Arbitrator find Owner to be in breach of this agreement, Owner hereby agrees to be bound by Court judgment, including payment of Purchaser's judicially rendered damages. Without limiting the generality of the foregoing, Owner agrees that Owner will not, at any time during the initial or extended option periods, directly or through third parties, enter into negotiations with others or exercise, authorize or permit the exercise by others of any of the rights covered by the option or any of the rights reserved by Owner under the provisions of Exhibit "A" which are not to be negotiated, exercised or licensed to others during any period of time therein specified.

2. CONSIDERATION FOR OPTION:  In consideration of payment to Owner of ten percent (10%) of the $50,000 consideration or $5,000, receipt of which is hereby acknowledged, Owner agrees to and does hereby give and grant to Purchaser the exclusive and irrevocable option to purchase from Owner the rights in the Property as described in Exhibit "A" for the total purchase price specified and payable as provided in Exhibit "A," provided that any sums paid under this Clause 2 or any other provision of this agreement with respect to the option shall be credited against the purchase price.  If Purchaser shall fail to exercise this option, then the sums paid to Owner hereunder with respect to the option shall be and remain the sole property of Owner.

3. OPTION PERIOD:  The within option shall be effective during the period commencing on the execution date of this agreement and ending twelve (12) months later (the "Initial Option Period").  The Initial Option Period shall be extended for two additional twelve (12) month periods (" Successive Option Period") by a payment of $5,000 each year, on or before the expiration date of the initial option period. Two successive option periods shall be allowed upon additional payments of $5000 per year to meet the availability and schedules of a director or star actor.

2

**4. EXERCISE OF OPTION:** (a) Notice of Exercise:  If Purchaser elects to exercise the within option, Purchaser (at any time during the option period) shall serve upon Owner written notice of the exercise thereof by addressing such notice to Owner at Owner's address as specified in Exhibit "A" and by depositing such notice, so addressed by certified mail, return receipt requested with postage prepaid, in the United States mail. The deposit of such notice in the United States mail as hereinabove specified shall constitute service thereof, and the date of such deposit shall be deemed to be the date of service of such notice.

(b) The purchase price shall be paid to Owner in accordance with Exhibit "A."

(c) The option may be exercised only by notice in writing as aforesaid; no conduct or oral statement by Purchaser or his agents, representatives or employees shall constitute an exercise of the option.

(d) Additional Documents:  If Purchaser exercises the within option, Owner, without cost to Purchaser (other than the consideration provided for herein or in Exhibit "A") shall execute, acknowledge and deliver to Purchaser, or shall cause the execution, acknowledgment and delivery to Purchaser of, such further instruments as Purchaser may reasonably require in order to confirm unto Purchaser the rights, licenses, privileges and property which are the subject of the within option.  If Owner shall fail to execute and deliver or to cause the execution and delivery to Purchaser of any such instruments, Purchaser is hereby irrevocably granted the power coupled with an interest to execute such instruments and to take such other steps and proceedings as may be necessary in connection therewith in the name and on behalf of Owner and as Owner's attorney-in-fact.  Owner shall supply all supporting agreements and documentation reasonably requested by Purchaser.

Without limiting the generality of the foregoing, Owner agrees to execute and deliver to Purchaser concurrently herewith Exhibit "B" (Short Form Option Agreement), which instrument shall become effective immediately and may be recorded by Purchaser with the United States Copyright Office as evidence of the option herein granted to Purchaser, and Owner agrees to cause the publisher or publishers of the Property, if any, and any other person, firm or corporation having or claiming any interest in or to the Property, to execute, acknowledge and deliver to Purchaser promptly upon the execution hereof, quitclaims or assignments in form satisfactory to Purchaser, whereby such publisher or other parties quitclaim to Owner all their right, title and interest (or acknowledge and agree that they have no such right, title or interest) in or to any of the rights, licenses, privileges and property agreed to be granted to Purchaser upon the exercise of the option. (e) Failure to Execute Documents:  If Owner shall fail to execute, acknowledge or deliver to Purchaser any agreements, assignments or other instruments to be executed, acknowledged and delivered by Owner hereunder, then Purchaser is hereby irrevocably appointed Owner's attorney-in-fact with full right, power and authority to execute, acknowledge and deliver the same in the name of and on behalf of Owner, Owner acknowledging that the authority and agency given Purchaser is a power coupled with an

3

interest. If the property has not been published or registered for copyright in the United States Copyright Office, and as a result thereof Exhibits "A," "B" and "C," attached hereto, have not been completed with respect to the publication and copyright data and other data, then Purchaser is authorized and instructed by Owner to insert the correct publication and copyright data in the appropriate blanks in Exhibits "A," "B" and "C" or after the property has been published and registered for copyright, and in this connection Owner agrees to notify Purchaser promptly in writing of the publication and registration of the Property for copyright, specifying in such notice the name of the publisher, the date and place of publication, the name of the copyright proprietor and the date and entry number of the copyright registration in the United States Copyright Office, all of which information may be inserted by Purchaser in the appropriate blanks in such documents.

**5. EFFECTIVENESS OF EXHIBITS "A," "B" AND "C":**  Concurrently with the execution of this agreement Owner has executed Exhibit "A" (Literary Purchase Agreement), Exhibit "B" (Short Form Option Agreement for Recordation) and Exhibit "C" (Assignment of the Copyright), which are undated, and it is agreed that if Purchaser shall exercise the option (but not otherwise) then the signature of Owner to Exhibits "A," "B" and "C" shall be deemed to be effective and these Exhibits shall constitute valid and binding agreements and assignment effective as of the date of exercise of such option, and Purchaser is hereby authorized and empowered to date such instruments accordingly. If Purchaser shall fail to exercise the option, then the signature of Owner to Exhibits "A," "B" and "C" shall be void and of no further force or effect whatever, and Purchaser shall not be deemed to have acquired any rights in or to the Property other than the option hereinabove provided for.  If Purchaser exercises the option, Purchaser will execute and deliver to Owner copies of Exhibit "A," dated as of the date of the exercise of the option, and Owner will, if so requested by Purchaser, execute and deliver to Purchaser additional copies of Exhibits "A," "B" and "C."  Notwithstanding the failure or omission of either party to execute and/or deliver such additional documents, it is agreed that upon the exercise of the option by Purchaser all rights in and to the Property agreed to be transferred to Purchaser pursuant to the provisions of Exhibit "A" shall be deemed vested in Purchaser, effective as of the date of exercise of the option, which rights shall be irrevocable, subject, however, to the reversion provisions of Paragraph 9 (c) hereunder.

**6. RIGHT TO ENGAGE IN FINANCING AND PRE-PRODUCTION:**  Owner acknowledges that Purchaser may during the option period, undertake financing and pre-production activities in connection with any of the rights to be acquired hereunder including, without limitation, securing investors and developing treatments and/or screenplays based on the Property.

**7. RESTRICTIONS:**  During the option period, Owner shall not exercise or otherwise utilize any of the rights herein granted to Purchaser and as more particularly described in Exhibit "A" hereof nor the rights reserved to Owner pursuant to Clause 2 (b) and 2(c) (Rights Reserved) of Exhibit "A," nor shall Owner solicit, entertain or negotiate offers from other parties which would in any manner or for any purpose unfairly compete with, interfere with or conflict with the full and unrestricted use of the rights herein granted to Purchaser and as described in Exhibit "A."

4

**8. ASSIGNMENT:** The assignment of this Option Agreement and the rights granted hereunder is subject to Owner's approval, unless Purchaser assigns to a major production company, motion-picture studio, cable or television network, or corporation engaged in the production of independent films.

**9. OPTION REVERSION:**

(a) If the Purchaser does not timely exercise the option during its original or extended terms and timely pay the purchase price, the option shall terminate and all rights in the Literary Property shall immediately revert to the Owner. The Owner shall retain all sums therefore paid. Purchaser shall immediately execute and deliver to Owner any assignments and documents required to effectuate the Reversion. If Purchaser shall fail or be unable to do so, Purchaser hereby grants owner a power coupled with an interest to execute and deliver such documents as Purchaser's attorney-in-fact.

(b) If Purchaser decides not to exercise the option in Clause 2, above, any time before the expiration of the option period, or decides not to extend such option, Purchaser agrees to notify Owner of such decision as soon as reasonable possible, but in no event later than the applicable option or extension deadline. When such notice is given, the option granted hereunder to Purchaser shall automatically revert to Owner.

(c) If Purchaser exercises option, but a motion picture is not made five (5) years after date of exercise, all rights revert to Owner, subject to Owner's repayment of purchase price (less amounts paid for the option periods), and upon Purchaser's execution of all documents to effectuate reversion.

**10. FORCE MAJEURE:** "Force Majeure" is defined as any fire, flood, earthquake or public disaster or computer virus; strike, labor dispute or unrest; embargo, riot, war, insurrection or civil unrest; any act of God, any act of legally constituted authority; or any other cause beyond the Purchaser's control which would excuse Purchaser's performance as a matter of law. If because of force majeure, Purchaser's performance hereunder is delayed or prevented, then the option period provided herein shall be extended for the time of such delay or prevention.

**11. GENDER AND NUMBER:** Terms used herein in the masculine gender include the feminine and neuter gender, and terms used in the singular number include the plural number, if the context may require.

**12. SECTION HEADINGS:** The headings of paragraphs, sections and other subdivisions of this agreement are for convenient reference only. They shall not be used in any way to govern, limit, modify, construe this agreement or any part or provision thereof or otherwise be given any legal effect.

5

DEC-31-2003 13:43 FROM:                    FAX NO. :          TO:612026254363          P.7/7

FROM :                                                         Dec. 30 2003 11:52PM P1

     DEC-31-2003 16:50 FROM:                                TO:0311= 25932435      P.2 :

**13. ARBITRATION:** This Agreement shall be interpreted in accordan : with the laws of the District of Columbia, applicable to agreements executed and to be wholly performed therein. Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreemen :, or the breach thereof, shall be resolved by arbitration in accordance with the rules and procedures of the American Film Marketing Association (AFMA), as said rules may be amended from time to time with rights of discovery if requested by the arbitrator. Such ules and procedures are incorporated and made a part of this Agreement by refere ce. If AFMA shall refuse to accept jurisdiction of such dispute, then the parties agree t arbitrate such matter before and in accordance with the rules of the American Arbitrat n Association under its jurisdiction in the District of Columbia before a single arbitrate familiar with entertainment law. The parties shall have the right to engage in pre-hear ig discovery in connection with such arbitration proceedings. The parties agree hereto ti it they will abide by and perform any award rendered in any arbitration conducted pu uant hereto, that any court having jurisdiction thereof may issue a judgment based up n such award and that the prevailing party in such arbitration and/or confirmation proc :ding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitra ion will be held in District of Columbia and any award shall be final, binding and non-ap ealable. The Parties agree to accept service of process in accordance with the AFMA I ules.

**14. ENTIRE AGREEMENT:** This agreement, including the Exhibits a ached hereto, contains the full and complete understanding and agreement between the arties with respect to the within subject matter, and supersedes all other agreements l tween the parties whether written or oral relating thereto, and may not be modified c amended except by written instrument executed by both of the parties hereto. This greement shall in all respects be subject to the laws of the District of Columbia. All the r thts, licences, privileges and property herein granted to Purchaser are irrevocable and no subject to rescission, restraint, or injunction under any or all circumstances.

**IN WITNESS WHEREOF,** the parties hereto have signed this Option Agr ement on December 12, 2003.

OWNER:   *Loida Nicolas Lewis*

Loida Nicolas Lewis

PURCHASER:   *Jesse Winberry Sr.*

Jesse Winberry on behalf of BroadcastUrban FilmWorks, L.L.C.

6

P.6/24          TO:12123198188                                    SEP-05-2007 11:25 FROM:



# EXHIBIT A

## Literary Purchase Agreement

This Agreement made on December 23, 2003 by and between Loida Nicolas Lewis (hereinafter referred to as "Owner") and BroadcastUrban FilmWorks, L.L.C. (hereinafter referred to as "Purchaser").

### WITNESSETH

WHEREAS, Owner is the sole and exclusive owner throughout the world of all rights in and to the Literary Property entitled: " Why Should White Guys Have All the Fun?," written by Reginald F. Lewis and Blair S. Walker, which work has been filed in the United States Copyright Office under Copyright Registration Number TX-4-000-690; this work including all adaptations and/or versions, the titles, characters, plots, themes and story line is collectively referred to as the "Property"; and

WHEREAS, Purchaser wants to acquire certain rights of the Owner in consideration for the purchase price provided herein and in reliance upon the Owner's representations and warranties;

NOW, THEREFORE, In consideration of the covenants and conditions set forth below, the sufficiency of which is acknowledged, the parties, intending to be legally bound, agree as follows:

**DEFINITIONS:**

1.1.   "AFMA" means the American Film Marketing Association arbitration panel.

1.2.   "Adaptation" means the process of deriving a story from a book, novel, biographical or autobiographical work and adapting it into a motion picture.

1.3.   "Assignee" means the person receiving property by assignment from another.

1.4   "Assignor" means the person transferring property to another.

1.5.   "Assigns" means the parties to whom property has or may be assigned.

1.6.   "Attorney-In-Fact" means the person authorized to act for another.

1.7.   "Authors" means Reginald F. Lewis and Blair S. Walker, the original writers of the Literary Property.

1.8.   "Consideration" means money or anything of value such as the the right, interest or benefit to one party, or the loss or forbearance of another.

1.9.   "Droit moral" is a French term which restricts the alteration of an original work.

1

1.10.   **"Indemnify"** means to reimburse another's loss by payment, repair or replacement.

1.11    **"Literary Purchase Agreement"** means a contract to acquire the rights in a literary property such as a book or a play.

1.12.   **"Literary Property"** means the book, "Why Should White Guys have all the fun?" by Reginald F. Lewis and Blair S. Walker.

1.13.   **."Net profits"** means the revenues remaining from a film after distribution and/or production costs have been recouped and allowable deductions have been taken.

1.14.   **"Novelization"** means a book adapted from a motion picture.

1.15.   **"Option"** means the exclusive right to purchase the rights to a motion picture in the future.

1.16.   **"Owner"** means Mrs. Loida Nicholas Lewis, the copyright owner of the Literary Property.

1.17.   **"Principal Photography"** means the filming of the main action and lead actors in a motion picture.

1.18.   **"Purchaser"** means BroadcastUrban FilmWorks, LLC, the buyer of the motion picture rights to the Literary Property.

1.19.   **"Soundtrack"** means the portion of a film reserved for the sound.

1.20.   **"Synchronization"** means the positioning of a soundtrack in harmony with, and timed to, the image portion of the film.

1.21.   **"WGA"** means the Writer's Guild of America.

1.22.   **Other Terms.**  All other terms shall have the meanings assigned to them in this Agreement.

**1. RIGHTS GRANTED:** Owner hereby sells, grants, conveys and assigns to Purchaser, its successors, licensees and assigns exclusively and forever, all motion picture rights (including all silent, sound dialogue and musical motion picture and soundtrack rights), all television motion picture and other television rights, together with limited radio broadcasting rights and 7,500 word publication rights for advertisement, publicity and exploitation purposes, incidental rights set forth in Section 1(j) and allied rights in and to the Literary Property, and in and to the copyright thereof and all renewals and extensions of copyright, such as sequels, remakes, merchandising, music publishing, soundtrack recordings, radio, novelization, photonovel and other publications for sale to the public, not including the publication rights reserved by Owner in this agreement. Included among the rights granted to Purchaser hereunder (without limiting the grant of rights hereinabove made) are the following sole and exclusive rights throughout the world:

(a) To make, produce, adapt and copyright one or more motion picture adaptations or versions, whether fixed on film, tape, disc, wire, audio-visual cartridge, cassette, CD-ROM, DVD, Internet or through any other technical process whether now known or hereafter devised, based in whole or in part on the Property, of every size, gauge, color or type, including, but not limited to, musical motion pictures and remakes of and sequels to any motion picture produced hereunder and motion pictures in series or serial form, and for such purposes to record and reproduce and license others to record and reproduce, in synchronization with such motion pictures, musical soundtracks or spoken words taken from or based upon the text or theme of the Property. Granted rights also includes any and all kinds of music, musical soundtracks, musical accompaniments and/or lyrics to be

2

produced, performed or sung by performers in or for the motion picture and any and all other kinds of sound and sound effects. None of the characters, except the character of Joseph Fugett, who is an actor and singer, are to sing unless Owner gives approval, which shall not be unreasonably withheld. Notwithstanding the foregoing, Owner shall have absolute approval of Owner or Mr. Lewis singing.

(b) To negotiate with motion picture or distribution studios, the earliest release date of film which contributes to the financial success of the film.

(c) To exhibit, perform, rent, lease and generally deal in and with any motion picture produced hereunder:

(i) by all means or technical processes whatsoever, whether now known or hereafter devised including, by way of example only, film, tape, disc, wire, audio-visual cartridge, cassette, CD-ROM, DVD, Internet or television (including commercially sponsored, cable, and subscription, satellite or pay-per-view television, or any derivative thereof); and

(ii) in any place whatsoever, including homes, theaters and elsewhere, and whether or not a fee is charged, directly or indirectly, for viewing any such motion picture.

(d) To broadcast, transmit or reproduce the Property or any adaptation or version thereof (including without limitations to, any motion picture produced hereunder and/or any script or other Property based on or utilizing the Property or any of the characters, provided Purchaser or its designee has obtained signed releases from all such individuals acknowledging their approval of such depiction, themes or plots thereof,  by means of television or any process analogous thereto whether now known or hereafter devised (including commercially sponsored, cable, sustaining and subscription or pay-per-view television, Internet and Video on Demand), through the use of motion pictures produced on films or by means of magnetic tape, wire, disc, audio-visual cartridge, DVD or any other device now known or hereafter devised and including such television productions presented in series or serial form, and the exclusive right generally to exercise for television purposes all the rights granted to Purchaser hereunder for motion picture purposes.

(e) Without limiting any other rights granted Purchaser, to broadcast and/or transmit by television or radio or any process analogous thereto whether now known or hereafter devised, all or any part of the Property or any adaptation or version thereof, including any motion picture or any other version or versions thereof, and announcements pertaining to said motion picture or other version or versions, for the purpose of advertising, publicizing or exploiting such motion picture or other version or versions, which broadcasts or transmissions may be accomplished through the use of living actors performing simultaneously with such broadcast or transmission or by any other method or means including the use of motion pictures (including trailers) reproduced on film or by means of magnetic tape or wire or through the use of other recordings or transcriptions.

3

(f) To publish and copyright or cause to be published and copyrighted in the name of Purchaser or its nominee in any and all languages throughout the world, in any form or media, synopses, of the Property, not exceeding 7,500 words each, adapted from the Property or from any motion picture and/or other version of the Property, soley for the purpose of advertising, publicizing and/or exploiting any such motion picture and/or other version.

(g) For the foregoing purposes to use all or any part of the Property and any of the characters (subject to obtaining signed releases from the individuals depicted), plots, themes and/or ideas contained therein, and the title of the Property and any title or subtitle of any component of the Property, and to use said titles or subtitles for any motion picture or other version of adaptation whether or not the same is based on or adapted from the Property and/or as the title of any musical composition contained in any such motion picture or other version or adaptation.

(h) To use and exploit commercial or merchandise tie-ups and recordings of any sort and nature arising out of or connected with the motion picture or other versions and/or the title or titles thereof; provided, however, that there shall be no endorsement, direct or implied, by Owner or Mr. Lewis of any product or service without Owner's consent.

(i) To advertise, promote and publicize the motion picture in any and all media now known or hereafter devised or authorize others to do so to the extent the use of the names, likenesses and images of characters are permitted under this agreement. Such advertising, promotion and publicity may include synopses or excerpts of the Literary Property, use of all characters, situations, objects, properties, designs, equipment or events depicted or described in the Property and use of all biographical media, publicity pieces and promotional materials on the life of Reginald F. Lewis owned by Owner.  Purchaser shall also have the right to use or exhibit such biographical media, or portions thereof, in connection with financing, advertising, promoting, publicizing or demonstrating the motion picture;

(j) INCIDENTAL RIGHTS:  without limiting the generality of the foregoing, the rights granted Owner shall also include:
(i) Titles:  To use the current title of the Literary Property or to use any other title;
(ii) Foreign Language Versions: To dub and/or subtitle the motion picture in foreign languages for use in such parts of the world as Purchaser may determine or authorize for distribution;
(iii) Names, Pictures, Voice, Likeness: To reproduce, publish, disseminate in any medium, or otherwise use in connection with the exploitation of any of the rights granted under this Agreement, the names, portraits, pictures, likenesses and voices of Owner and Mr. Lewis, as set forth in Section 10 of this Agreement.
(iv) Use of Names, Photographs and Logos and Trademarks: To use such names, photographs, logos or trademarks which are owned by Owner and included or referred to in the Literary Property. To the extent Owner does not own these materials, Owner shall

4

use best efforts to assist Purchaser in obtaining rights to use these materials in Picture.

All rights, licenses, privileges and property herein granted Purchaser shall be cumulative and Purchaser may exercise or use any or all said rights, licenses, privileges or property simultaneously with or in connection with or separately and apart from the exercise of any other of said rights, licenses, privileges and property. If Owner hereafter makes or publishes or permits to be made or published any revision, adaptation, sequel, translation or dramatization or other versions of the Property, then Purchaser shall have and Owner hereby grants to Purchaser without payment therefore all of the same rights therein as are herein granted Purchaser, subject to the provisions of Section 2 (d). The terms "Picture" and "Pictures" as used herein shall be deemed to mean or include any present or future kind of motion picture production based upon the Property, with or without sound recorded and reproduced synchronously therewith, whether the same is produced on film or by any other method or means now or hereafter used for the production, exhibition and/or transmission of any kind of motion picture productions.

2. RIGHTS RESERVED:  The following rights are reserved to Owner for Owner's use and disposition, subject, however, to the provisions of this agreement:

(a) Publication Rights:  The right to publish and distribute printed versions of the Property owned or controlled by Owner in book form, whether hardcover, soft-cover, audio or electronic, and in magazine or other periodicals, whether in installments or otherwise subject to Purchaser's rights as provided for in Clause 1, supra
During the term of this agreement, Owner may engage in a separately negotiated agreement with Purchaser to market the re-release of the Property in conjunction with the promotion of the motion picture.

(b) Stage Rights:  The right to perform the Property or adaptations thereof on the spoken stage with actors appearing in person in the immediate presence of the audience, provided no broadcast, telecast, recording, photography or other reproduction of such performance is made.  Owner agrees not to exercise, or permit any other person to exercise, said stage rights earlier than five (5) years after the first general release or telecast, if earlier, of the first Picture produced hereunder, or, if the Picture is not released, earlier than five (5) years after the exercise of the option hereunder.

(c) Radio Rights:  The right to broadcast the Property by sound (as distinguished from visually) by radio, subject however to Purchaser's right at all times to: (i) exercise its radio rights provided in Clause 1 supra for advertising and exploitation purposes by living actors or otherwise, by the use of excerpts from or condensations of the Property or any Picture produced hereunder; and (ii) in any event to broadcast any Picture produced hereunder by radio.  Owner agrees not to exercise, or permit any other person to exercise, Owner's radio rights earlier than five (5) years after the first general release or initial telecast, if earlier, of the first Picture produced hereunder or, if the Picture is not released, earlier than five (5) years after the exercise of the option hereunder.

5

(d) Author-Written Sequel:  A literary property (story, novel, biography, drama or otherwise), whether written before or after the Property and whether written by Owner or by a successor in interest of Owner, using one or more of the characters appearing in the Property, participating in different events from those found in the Property, and whose plot is substantially different from that of the Property.  Owner shall have the right to exercise publication rights (i.e., in book or magazine form) at any time.  Owner agrees not to exercise, or permit any other person to exercise, any other rights (including but not limited to motion picture or allied rights) of any kind in or to any author-written sequel earlier than five (5) years after the first release of the first Picture produced hereunder, provided such restriction on Owner's exercise of said author-written sequel rights shall be extended to any period during which there is in effect, in any particular country or territory, a network television broadcasting agreement for a television motion picture, (i) based upon the Property, or (ii) based upon any Picture produced in the exercise of rights assigned herein, or (iii) using a character or characters of the Property, plus one (1) year, which shall also be a restricted period in such country or territory, whether or not such period occurs wholly or partly during or entirely after the 5 year period first referred to in this clause. Notwithstanding the foregoing, (i) Owner also reserves the right to write or cause to be written any biography of her life and or of the lives of her children and shall have no obligation whatsoever to Producer in connection therewith and (ii) Owner's children reserve the right to write or cause to be written a biography of their lives or of their father's life and shall have no obligation whatsoever to Purchaser.

(e) Inasmuch as the characters of the Property are included in the exclusive grant of motion picture rights to Purchaser (subject to Purchaser, with Owner's help, obtaining signed releases from all such individuals), no sequel rights or television series rights may be granted to such other person or company, but such characters from the Property which are contained in the author-written sequel may be used in a film and remakes thereof whose plot is based substantially on the plot of the respective author-written sequel, subject to Purchaser, with Owner's written requests, obtaining signed releases from such characters authorizing their depiction in any such audio-visual work.

It is expressly agreed that Owner's reserved rights under this subclause relate only to Property written or authorized by Owner and not to any revision, adaptation, sequel, translation or dramatization written or authorized by Purchaser, even though the same may contain characters or other elements contained in the Property.

**3. CREATIVE RIGHTS.** Owner agrees that Purchaser shall have the unlimited right to vary, change, alter, modify, add to and/or delete from the Property, and to rearrange and/or transpose the Property and change the title or sequence thereof and the characters and descriptions of the characters contained in the Property, and to use a portion or portions of the Property or the characters, plots, or theme thereof in conjunction with any other literary, dramatic or other Property of any kind.  Owner hereby waives the benefits of any provisions of law known as the "droit moral" or any similar law in any country of the world and agrees not to permit or prosecute any action or lawsuit on the ground that any Picture or other version of the Property produced or exhibited by Purchaser, its assignees or licensees, in any way constitutes an infringement of any of the Owner's droit

6

moral or is in any way a defamation or mutilation of the Property or any part thereof or contains unauthorized variations, alterations, modifications, changes or translations. Owner further agrees that principal character of Reginald F. Lewis may be portrayed in motion picture as long as screen portrayal is not libelous or slanderous.

**4. DURATION AND EXTENT OF RIGHTS GRANTED:**  Purchaser shall enjoy, solely and exclusively, all the rights licenses, privileges and property granted hereunder throughout the world, in perpetuity, as long as any rights in the Property are recognized in law or equity, except insofar as such period of perpetuity may be shortened due to any now existing or future copyright by Owner of the Property and/or any adaptations thereof, in which case Purchaser shall enjoy its sole and exclusive rights, licenses, privileges and property hereunder to the fullest extent permissible under and for the full duration of such copyright or copyrights, whether common law or statutory, and any and all renewals and/or extensions thereof, and shall thereafter enjoy all such rights, licenses, privileges and property non-exclusively in perpetuity throughout the world.  The rights granted herein are in addition to and shall not be construed in derogation of any rights which Purchaser may have as a member of the public or pursuant to any other agreement.

All rights, licenses, privileges and property granted herein to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances, but are, however, subject to owner's reversion rights set forth in Section 9 (c) of the Option/Literary Purchase Agreement.

**5. CONSIDERATION:**  As consideration for all rights granted and assigned to Purchaser and for owner's representations and warranties, Purchaser agrees to pay to Owner on the commencement of principal photography, and Owner agrees to accept $50,000 for all the rights granted including the production of a first release theatrical or television motion picture. Payment for each remake or sequel motion picture should be an additional $50,000; payment for any television series or mini-series should be subject to good faith negotiation.

Additionally, Purchaser agrees to pay to Owner, and Owner agrees to accept contingent compensation of five percent (5%) of one-hundred percent (100%) of the net profits (including allied and ancillary rights) of each motion picture and television program or series based on the Property, in whole or in part, with profits defined according to the same definition obtained by Purchaser; provided, however, that Owner actively works with Purchaser to promote and secure financing for film by attending meetings with potential investors, actors and film industry executives scheduled at a mutually convenient time for Purchaser and Owner, appearing in video presentations and media interviews, signing fundraising letters, allowing the use of Owner's and Mr. Lewis' names and likenesses in investor presentations and correspondence and introducing Purchaser to potential investors in Picture. Owner shall also provide Purchaser copies of all biographical media, including such versions as she owns of the American Legacy Television Series/Video Collection documentary on Mr. Lewis' life.  To the extent Owner does not own the above biographical materials, Owner shall use best efforts to assist Purchaser in obtaining rights to use these materials.

7

## 6. REPRESENTATIONS AND WARRANTIES:

(a) Sole Proprietor:  Owner represents and warrants to Purchaser that Owner is the sole and exclusive proprietor, throughout the universe, of that certain original literary Property written by Reginald F. Lewis and Blair S. Walker entitled " Why Should White Guys Have All the Fun?."

(b) Facts:  Owner represents and warrants to Purchaser as follows:
(i) Messers. Lewis and Walker are the sole authors of the Property.
(ii) The Property was first published on October 14, 1994 by John Wiley & Sons, Inc., under the title of " Why Should White Guys Have All the Fun?," and was registered for copyright on March 17, 1995 in the name of Loida Nicolas Lewis, under Copyright registration number TX-4-000-690 in the office of the United States Register of Copyrights, Washington D.C.
(iii) Except with respect to the publication of the Property as set forth above and a television documentary on Mr. Lewis' life for the American Legacy Television Series/Video Collection, no motion picture or dramatic version of the Property, or any part thereof, has been manufactured, produced, presented or authorized; no radio or television development, presentation, or program based on the Property, or any part thereof, has been manufactured, produced, presented, broadcast or authorized ; and no written or oral agreements or commitments whatsoever with respect to the Property, or with respect to any rights therein, have been made or entered into by or on behalf of Owner.
(iv) None of the rights herein granted and assigned to Purchaser have been granted and/or assigned to any person, firm or corporation other than Purchaser.

(c) No Infringement or Violation of Third Party Rights:  Owner represents and warrants to Purchaser that Owner has not adapted the Property from any other literary, dramatic or other Property of any kind, nature or description, nor, except for Property which is in the public domain, has Owner copied or used in the Property the plot, scenes, sequence or story of any other literary, dramatic or other Property; that the Property does not infringe upon any common law or statutory rights in any other literary, dramatic or other Property; that, to the best of Owner's knowledge, no dialogue contained in the Property is libelous or violative of the right of privacy of any person;  and that the Property is not in the public domain in any country in the world where copyright protection is available. Owner agrees to work with Purchaser to obtain signed releases from all living characters depicted in the Property permitting Purchaser to portray their character in film.

(d) No Impairment of Rights:  Owner represents and warrants to Purchaser that Owner is the exclusive proprietor, throughout the universe, of all rights in and to the Property granted herein to Purchaser; that Owner has not assigned, licensed or in any manner encumbered, diminished or impaired any such rights; that Owner has not committed or omitted to perform any act by which such rights could or will be encumbered, diminished or impaired; and that to the best of Owner's knowledge; there is no outstanding claim or

8

litigation pending against or involving the title, ownership and/or copyright in the Property, or in any part thereof, or in any rights granted herein to Purchaser. Owner further represents and warrants that Owner will make no attempt hereafter to encumber, diminish or impair any of the rights granted herein and that all appropriate protection of such rights will continue to be maintained by Owner.

## 7. INDEMNIFICATION:

(a) Owner agrees to indemnify Purchaser against all judgments, liability, damages, penalties, losses and expense (including reasonable attorneys' fees) which may be suffered or assumed by or obtained against Purchaser by reason of any breach or failure of any warranty or agreement herein made by Owner.

(b) Purchaser agrees to indemnify Owner against any and all claims arising out of the development, production and exploitation of any motion picture or other audio-visual production produced hereunder, except those claims arising out of a breach of Owner's representations and warranties. Purchaser shall not be liable to Owner for damages for any breach of this agreement (except failure to pay the money consideration herein specified) before Purchaser has had at least sixty (60) days notice and opportunity to adjust or correct such matters.

(c) All rights, licenses and privileges herein granted to Purchaser are irrevocable and not subject to rescission, restraint or injunction under any circumstances, except pursuant to a reversion of rights to Owner as more fully set forth in Section 9 (c) of the Option/Literary Purchase Agreement and Section four (4) of this Exhibit A thereto.

(d) Purchaser agrees to include Owner as one of the insured parties under Purchaser's Errors and Omissions insurance policy.

## 8. PROTECTION OF RIGHTS GRANTED:
Owner hereby grants to Purchaser the free and unrestricted right, but at Purchaser's own cost and expense, to institute in the name and on behalf of Owner, or Owner and Purchaser jointly, any and all suits and proceedings at law or in equity, to enjoin and restrain any infringements of the rights herein granted, and hereby assigns and sets over to Purchaser any and all causes of action relative to or based upon any such infringement, as well as any and all recoveries obtained thereon. Owner will not compromise, settle or in any manner interfere with such litigation if brought; and Purchaser agrees to indemnify and hold Owner harmless from any costs, expenses, or damages which Owner may suffer as a result of any such suit or proceeding. Owner reserves the right to be represented by Owner's own legal counsel at Owner's expense

## 9. COPYRIGHT:
Regarding the copyright in and to the Property, Owner agrees that:

(a) For the period that the Property is protected by copyright under the laws of the United States, Owner will use all reasonable efforts to prevent the Property and any arrangements, revisions, translations, novelizations, dramatizations or new versions

9

thereof whether published or unpublished and whether copyrighted or uncopyrighted, from vesting in the public domain, and will take or cause to be taken any and all steps and proceedings required for copyright or similar protection in any and all countries in which the same may be published or offered for sale, insofar as such countries now or hereafter provide for copyright or similar protection. Any contract or agreement entered into by Owner authorizing or permitting the publication of the Property or any arrangements, revisions, translations, novelizations, dramatizations or new versions thereof in any country will contain appropriate provisions requiring such publisher to comply with all the provisions of this clause.

(b) Without limiting the generality of the foregoing, if the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof is published in the United States or in any other country in which registration is required for copyright or similar protection in accordance with the laws and regulations of such country, and Owner further agrees to affix or cause to be affixed to each copy of the Property or any arrangement, revision, translation, novelization, dramatization or new version thereof which is published or offered for sale such notice or notices as may be required for copyright or similar protection in any country in which such publication or sale occurs.

(c) At least six (6) months prior to the expiration of any copyright required by this provision for the protection of the Property, Owner will renew (or cause to be renewed) such copyright, as permitted by applicable law, and any and all rights granted Purchaser hereunder shall be deemed granted to Purchaser throughout the full period of such renewed copyright, without the payment of any additional consideration, it being agreed that the consideration payable to Owner under this agreement shall be deemed to include full consideration for the grant of such rights to Purchaser throughout the period of such renewed copyright.

(d) If the Property, or any arrangement, revision, translation, novelization, dramatization or new version thereof, shall ever enter the public domain, then nothing contained in this agreement shall impair any rights or privileges that the Purchaser might be entitled to as a member of the public; thus, the Purchaser may exercise any and all such rights and privileges as though this agreement were not in existence. The rights granted herein by Owner to Purchaser, and the representations, warranties, undertakings and agreements made hereunder by Owner shall endure in perpetuity and shall be in addition to any rights, licenses, privileges or property of Purchaser referred to in this subclause (d).

(e) Subject to the reversion provisions of Section 9 (c) of the Literary Option/Purchase Agreement and Section four (4) of this Exhibit A, all rights granted or agreed to be granted to Purchaser under this Agreement shall be irrevocably vested in Purchaser and shall not be subject to rescission by Owner or any other party for any cause, nor shall said rights be subject to termination or reversion by operation of law or otherwise, except to the extent, if any, that the provisions of any copyright law or similar law relating to the right to terminate grants of, or recapture rights in, literary property may apply. If, pursuant to any such copyright law or similar law, Owner or any successor or any other legally designated party (all herein referred to as "the terminating party") becomes

10

entitled to exercise any right to reversion, recapture or termination ( the "termination right") with respect to all or any part of the rights granted or to be granted under this Agreement, and if the terminating party exercises said termination right with respect to all or part of said rights (the "recaptured rights"), then from and after the date on which the terminating party has the right to transfer to a third party all or part of the recaptured rights, Purchaser shall have the first right to purchase and acquire the recaptured rights from the terminating party. If the terminating party is prepared to accept a bona fide offer from a third party with respect to all or part of the recaptured rights, then in each such instance the terminating party shall notify Purchaser of such offer which the terminating party is prepared to accept and the name of the third party who made the offer to the terminating party, and the terminating party shall offer Purchaser the right to enter into an agreement with the terminating party with respect to the recaptured rights on the aforesaid terms and conditions. Purchaser shall have 30 days from the date of its receipt of such written offer within which to notify the terminating party of its acceptance of such offer (provided, however, the Purchaser shall not be required to meet any terms or conditions which cannot be as easily met by one person as another, including, without limitation, the employment of a specified person, etc.) If Purchaser shall acquire from the terminating party all or part of the recaptured rights, then the terminating party agrees to enter into appropriate written agreements with Purchaser covering said acquisition. If Purchaser shall elect not to purchase the recaptured rights from the terminating party, then the terminating party may dispose of said recaptured rights, but only to the aforesaid third party and only upon the terms and conditions specified in the aforesaid written notice given by the terminating party to Purchaser, it being understood and agreed that the terminating party may not dispose of said recaptured rights either to: (a) any other proposed transferee; or (b) upon terms and conditions which are more favorable to any transferee than the terms and conditions previously offered to Purchaser hereunder, without again offering to enter into an agreement with Purchaser on: (i) the terms offered to such other transferee; or (ii) such more favorable terms and conditions offered to said proposed transferee, whichever of (a) or (b) shall apply. Any such required offer made to Purchaser by the terminating party shall be governed by the procedure set forth in the preceding four sentences of this Section. The unenforceability of any portion of this Section shall not invalidate or affect the remaining portions of this Section of this Agreement.

**10. CREDIT OBLIGATIONS:** Purchaser shall have the right to publish, advertise, announce and use in any manner or medium, the name, approved biography and approved photographs or approved likenesses of Owner and Mr. Lewis in connection with any exercise by Purchaser of its rights hereunder, provided such use shall not constitute an endorsement of any product or service, and provided that Owner's approval shall not be unreasonably delayed.

During the term of the Writer's Guild of America Minimum Basic Agreement ("WGA Agreement"), as it may be amended, the credit provisions of the WGA Agreement shall, insofar as it is applicable, govern the determination of credits, if any, which the Purchaser shall accord the Owner hereunder in connection with photoplays. If the Purchaser or his assignee is not a party to said WGA Agreement, the provisions of the WGA Agreement

11

shall no longer directly govern the determination of such credits, and when the WGA Agreement or any amendment is not effective as between the Purchaser or assignee and Writer's Guild of America, such credits shall be determined with reference to the Credit rules of the WGA, with any dispute arbitrated by the American Arbitration Association.

Subject to the foregoing, Owner shall be accorded STORY CONSULTANT credit on a single card on screen and in paid ads in which any screenwriter is accorded credit, and in size of type (as to height, width, thickness and boldness) equal to the largest size of type in which any writer is accorded credit:

(a) If the title of the Picture is the same as the title of the Property,

" Based on the book by Reginald F. Lewis and Blair S. Walker";

or

(b) If the title of the Picture differs from the title of the Property,

"Based on the book, "Why Should White Guys have all the Fun? by Reginald F. Lewis and Blair S. Walker"

Credit to the Property and the authors thereof shall be accorded on a single card on screen and in paid ads in which any screenwriter is accorded credit, and in size of type (as to height, width, thickness and boldness) equal to the largest size of type in which any writer is accorded credit. Additionally, if Purchaser shall exploit any other rights in and to the Property such as VHS, DVD, cable or television distribution rights, then Purchaser agrees to give appropriate source material credit to the Property, to the extent that such source material credits are customarily given in connection with the exploitation of such rights.

No casual or inadvertent failure to comply with any of the provisions of this clause shall be deemed a breach of this agreement by the Purchaser. Owner hereby expressly acknowledges that in the event of a failure or omission constituting a breach of the provisions of this Section, the damage (if any) caused Owner thereby is not irreparable or sufficient to entitle Owner to injunctive or other equitable relief. Consequently, Owner's rights and remedies in the event of such breach shall be limited to the right to recover damages in an action at law.

**11. RIGHT OF FIRST NEGOTIATION:** If Purchaser exercises the within option or pays for the successive option periods provided for in Section 3 of the Option to the Literary Purchase Agreement, Purchaser shall have a right of first negotiation on all Reserved Rights. The term "Right of First Negotiation" means that if, after the expiration of an applicable time limitation, Owner desires to dispose of or exercise a particular right reserved to Owner herein ("Reserved Right"), whether directly or indirectly, then Owner shall notify Purchaser in writing and immediately negotiate with Purchaser regarding such Reserved Right. If, after the expiration of thirty (30) days following the receipt of

12

such notice, no agreement has been reached, then Owner may negotiate with third parties regarding such Reserved Right subject to Clause 12 infra.

**12. RIGHT OF LAST REFUSAL:** If Purchaser exercises the within option or pays for the successive option periods provided for in Section 3 of the Option, Purchaser shall have a right of last refusal on all Reserved Rights. The term "Right of Last Refusal" means that if Purchaser and Owner fail to reach an agreement pursuant to Purchaser's right of first negotiation, and Owner makes and/or receives any bona fide offer to license, lease and/or purchase the particular Reserved Right or any interest therein ("Third Party Offer"), and if the proposed purchase price and other Property terms of a Third Party Offer are no more favorable to Owner than the terms which were acceptable to Purchaser during the first negotiation period, Owner shall notify Purchaser, by registered mail, if Owner proposes to accept such Third Party Offer, the name of the offeror, the proposed purchase price, and other terms of such Third Party Offer.  During the period of twenty (20) business days after Purchaser's receipt of such notice, Purchaser shall have the exclusive option to license, lease and/or purchase, as the case may be, the particular Reserved Right or interest referred to in such Third Party Offer, at the same purchase price and upon the same terms and conditions as set forth in such notice.  If Purchaser elects to exercise thereof by registered mail within such twenty (20) business day period, failing which Owner shall be free to accept such Third Party Offer; provided that if any such proposed license, lease and/or sale is not consummated with a third party within twenty (20) business days following the expiration of the aforesaid twenty (20) business day period, Purchaser's Right of Last Refusal shall revive and shall apply to each and every further offer or offers at any time received by Owner relating to the particular Reserved Right or any interest therein; provided, further, that Purchaser's option shall continue in full force and effect, upon all of the terms and conditions of this Section, so long as Owner retains any rights, title or interests in or to the particular Reserved Right. Purchaser's Right of Last Refusal shall inure to the benefit of Purchaser, its successors and assigns, and shall bind Owner, its heirs, successors and assigns.

**13. NO OBLIGATION TO PRODUCE:** Nothing herein shall obligate Purchaser to produce, distribute, release, perform or exhibit any motion picture, television, theatrical or other production based upon, adapted from or suggested by the Property, in whole or in part, or otherwise to exercise, exploit or make any use of any rights, licenses, privileges or property granted herein to Purchaser; provided, however, that if Purchaser exercises the option but the initial motion picture is not produced within five (5) years of such exercise, all rights shall revert to Owner as more fully set forth in Section 9 (c) of the Option/Literary Purchase Agreement and Section four (4) of this Exhibit A.

**14. ASSIGNMENT:** Purchaser may assign and transfer this agreement or all or any part of its rights hereunder to any person, firm or corporation subject to Owner's approval, unless Purchaser assigns to a major production company, motion-picture studio, cable or television network, or corporation engaged in the production of independent film. This agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, representatives and assigns forever.

13

**15. NO PUBLICITY:** Prior to the commencement of principal photography, Owner will not, without Purchaser's prior written consent in each instance, issue or authorize the issuance or publication of any news story or publicity relating to (i) this Agreement, (ii) the subject matter or terms hereof, or to any use by Purchaser, its successors, licensees and assigns, and (iii) any of the rights granted Purchaser hereunder.

**16. AGENT COMMISSIONS:** Purchaser shall not be liable for any compensation or fee to any agent, attorney or other representative of Owner in connection with this Agreement.

**17. ADDITIONAL DOCUMENTATION:** Owner agrees to execute and procure any other and further instruments necessary to transfer, convey, assign and copyright all rights in the Property granted herein by Owner to Purchaser in any country throughout the world. If it shall be necessary under the laws of any country that copyright registration be acquired in the name of Owner, Purchaser is hereby authorized by Owner to apply for said copyright registration thereof; and, in such event, Owner shall and does hereby assign and transfer the same unto Purchaser, subject to the rights in the Property reserved hereunder by Owner. Owner further agrees, upon request, to duly execute, acknowledge, procure and deliver to Purchaser such short form assignments as may be requested by Purchaser for the purpose of copyright recordation in any country, or otherwise. If Owner shall fail to so execute and deliver, or cause to be executed and delivered, the assignments or other instruments herein referred to, Purchaser is hereby irrevocably granted the power coupled with an interest to execute such assignments and instruments in the name of Owner and as Owner's attorney-in-fact.

**18. OWNER APPROVALS:** Owner shall not encumber, diminish or impair any of the rights granted herein by delaying decisions which are time-sensitive and which require Owner's prior approval longer than five (5) business days after Purchaser's initial written notice. If Owner fails to either communicate Owner's decision to Purchaser, or request more time on a time sensitive matter requiring Owner's prior approval within the five (5) day decision period, Purchaser is hereby irrevocably granted the power coupled with an interest to execute such decisions in the name of Owner and as Owner's attorney-in-fact.

**19. NOTICES:** All notices to Purchaser under this agreement shall be sent by United States registered mail, postage prepaid, or by overnight courier (FedEx, UPS, etc.) addressed to Purchaser at 1101 – 30th Street, N.W. 5th Floor Washington, D.C. 20007 and all notices to Owner under this agreement shall be sent by United States registered mail, postage prepaid, or by overnight courier addressed to 115 East 57th Street, Suite 1430 New York, NY 10022. The deposit of such notice in the United States mail or the delivery of the telegram message to the telegraph office shall constitute service thereof, and the date of such deposit shall be deemed to be the date of service of such notice.

**20. ARBITRATION:** This Agreement shall be interpreted in accordance with the laws of the State of District of Columbia, applicable to agreements executed and to be wholly

14

performed therein.  Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration in accordance with the rules and procedures of the American Film Marketing Association (AFMA), as said rules may be amended from time to time with rights of discovery if requested by the arbitrator.  Such rules and procedures are incorporated and made a part of this Agreement by reference.  If AFMA shall refuse to accept jurisdiction of such dispute, then the parties agree to arbitrate such matter before and in accordance with the rules of the American Arbitration Association under its jurisdiction in District of Columbia before a single arbitrator familiar with entertainment law.  The parties shall have the right to engage in pre-hearing discovery in connection with such arbitration proceedings.  The parties agree hereto that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitration will be held in District of Columbia and any award shall be final, binding and non-appealable.  The Parties agree to accept service of process in accordance with the AFMA Rules.

## 21. MISCELLANEOUS:

(a) Relationship:  This agreement between the parties does not constitute a joint venture or partnership of any kind.

(b) Cumulative Rights and Remedies:  All rights, remedies, licenses, undertakings, obligations, covenants, privileges and other property granted herein shall be cumulative, and Purchaser may exercise or use any of them separately or in conjunction with any one or more of the others.

(c) Waiver:  A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

(d) Severability:  If any provision of this agreement as applied to either party or any circumstances shall be adjudged by a court to be void and unenforceable, such shall in no way affect any other provision of this agreement, the application of such provision in any other circumstance, or the validity or enforceability of this agreement.

(e) Governing Law:  This agreement shall be construed in accordance with the laws of the District of Columbia.

(f) Captions:  Captions are inserted for reference and convenience only and in no way define, limit or describe the scope of this agreement or intent of any provision.

(g) Admissions: Purchaser shall provide Owner and a limited number of guests special V.I.P. admissions to all screenings and premieres of motion picture under Purchaser's control. Conversely, Owner shall provide Purchaser and limited guests special V.I.P.

15

admissions to all events under Owner's control honoring Mr. Lewis prior to and during the release of film.

(h) Copies: Owner shall be provided complimentary VHS and DVD copies of motion picture when available to the public.
(i) Amendment: This agreement may be modified or amended in writing, if both parties agree to the modification or amendment in writing.

(j) Entire Understanding: This agreement, together with the Option/Purchase Agreement and accompanying Exhibits, contains the entire understanding of the parties relating to the subject matter, and there are no other promises or conditions in any other agreement whether oral or written, concerning the subject matter of this Contract. This agreement supersedes any prior written or oral agreements between the parties.

IN WITNESS WHEREOF, the parties have signed this Agreement on December 23, 2003.

Loida Nicolas Lewis
("Owner")

Jesse Wineberry on behalf of
BroadcastUrban FilmWorks, LLC.
("Purchaser")

16



**BroadcastURBAN.com**

I N T E R N E T W O R K S

## EXHIBIT B

### Option Agreement
*(Short Form for Recordation at U.S. Copyright Office)*

For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned (the "Owner") hereby grants to BroadcastUrban FilmWorks, LLC (the "Purchaser"), its successors and assigns, the sole and exclusive option to purchase all motion picture and certain allied rights, in the original literary and/or dramatic work (the "Work") described as follows:

Title: Why Should White Guys Have All the Fun?
Author: Reginald F. Lewis and Blair S. Walker
Publisher: John Wiley and Sons, Inc.
Date of Publications: October 14, 1994
Copyright Registration: TX-4-000-690
Copyright Registrant: Loida Nicolas Lewis

RECEIVED

DEC 3 0 2003

COPYRIGHT OFFICE
PUBLIC OFFICE

The Work includes but is not limited to: (i) all contents; (ii) all present and future adaptations and versions; (iii) the title, characters and theme; and (iv) the copyright and all renewals and extensions of copyright.

This instrument is executed in accordance with and is subject to the agreement (the "Option and Literary Purchase Agreement") between the undersigned and the Purchaser dated as of December 23, 2003 relating to the option granted to the Purchaser to purchase the above-mentioned rights in the Work, which rights are more fully described in the Purchase Agreement, attached to the Option Agreement.

Date: December 23, 2003

Owner: *Loida N Lewis*
      Loida Nicolas Lewis

RECEIVED

DEC 3 0 2003

COPY...

Attest: *Lilly Black*
(name of witness)

LILLY BLACK
Notary Public, State of New York
No. 01BL5053286
...ed in New York County
...on Expires Dec. 11, 20 05



# Exhibit C

### *(Short Form Copyright Assignment)*

KNOW ALL MEN and WOMEN BY THESE PRESENTS that, in consideration of one dollar ($1.00) combined with other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned Loida Nicolas Lewis ("Assignor") do(es) hereby sell, grant, convey and assign unto BroadcastUrban Filmworks, LLC ("Assignee"), its successors, assigns and licensees forever, all right, title and interest including but not limited to the exclusive worldwide Motion Picture and allied rights of Assignor in and to that certain literary work to wit: that certain original biography written by Reginald F. Lewis and Blair S. Walker entitled " Why Should White Guys Have All the Fun?," ("Literary Property"), and all drafts, revisions, arrangements, adaptations, dramatizations, translations, sequels and other versions of the Literary Property which may heretofore have been written or which may hereafter be written with the sanction of Assignor.

All rights, licenses, privileges and property granted herein to Assignee are irrevocable and not subject to rescission, restraint or injunction under any circumstances, but are, however, subject to Assignor's reversion rights as set forth in Paragraph 9 (c) of the Option/Literary Purchase Agreement (the "Agreement"). This assignment is subject to all provisions of the Agreement; in the event of any conflict between the assignment and the Agreement, the Agreement shall control.

Dated this 30th day of December, 2003.

*Loida N Lewis*

Loida Nicholas Lewis ("Assignor")

AGREED TO: *J.Wineberry Sr.*

Jesse Wineberry on behalf of BroadcastUrban Filmworks, LLC ("Assignee")

**RECEIVED**

**DEC 3 0 2003**

COPYRIGHT OFFICE

STATE OF   ) *District of Columbia*
                ) ss.:
COUNTY OF  )

On the 30 day of December, 2003, before me personally came *Jesse Wineberry, Sr.* to me known and known to be the individual described in and who executed the foregoing instrument, and he did duly acknowledge to me that he executed the same.

Notary Public *Mary F. Vincent*      Seal expires: 03-31-08